UNITED STATES, Appellee

v.

GEORGE F. SIMONE, Private E-1, U. S. Army, Appellant

6 USCMA 146, 19 CMR 272

*Captain Albert C. Malone, Jr.*, argued the cause for Appellant, Accused. On the brief were *Lieutenant Colonel Joseph L. Chalk* and *Captain Frank C. Stetson.*

*Lieutenant Colonel Andrew D. Kane* argued the cause for Appellee, United States.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

A general court-martial sitting at Fort Dix, New Jersey, found the accused, Simone, guilty of desertion terminated by apprehension—in violation of the Uniform Code of Military Justice, Article 85, 50 USC § 679. The sole evidence tending to show the fact of apprehension was reflected in Prosecution Exhibit 1, an extract copy of a unit morning report. This evidence took the form of an entry asserting that the accused was "app civ auth Bklyn NY & rtn mil cont Conf Ft Jay NY EDCSA 10 Sept 54 & conf post stockade eff 14 Sep 54." Translated, this entry recites that Simone was apprehended by civilian authorities in Brooklyn, and was thereafter returned to confinement under military control. The only issue before us on the accused's present appeal has to do with whether this data, set out in a morning report, may suffice to sustain a finding of apprehension.

## II

In three cases in the past we have considered the effect of entries in official records when offered ▉▉▉▉▉▉ in evidence to establish the termination of a desertion by apprehension. The first of these was United States v. Coates, 2 USCMA 625, 10 CMR 123, which involved a service record entry relating in substance that the:

". . . Accused was apprehended by civilian authorities at Laurens, South Carolina, April 9, 1952. At that time he was dressed in civilian clothes. On April 11 he was surrendered to military control at Donaldson Air Force Base, Greenville, South Carolina, and placed in the station hospital there under guard. Later during the same day, he escaped through a window of his hospital quarters. Three days thereafter, on April 14, he was apprehended once more by civilian police and surrendered a second time to authorities at Donaldson Air Force Base. On April 16 he was delivered to the United States Navy Recruiting Substation, Greenville, South Carolina. Thence he was transferred to the Recruiting Station at Columbia, South Carolina, and, from there to the Receiving Station, Charleston, South Carolina."

We observed in that case that the provisions of Article C–7804 of the Navy's Bureau of Personnel Manual directed that a commanding officer report in an absentee's service record, "Circumstances of return, whether surrendered or delivered." This provision we interpreted to demand that the reporting officer prepare "a report of whether the absentee was apprehended, together with other relevant facts."

Later in United States v. Bennett, 4 USCMA 309, 15 CMR 309, there was brought into question the effect of an entry contained in the service record of a Marine Corpsman, which indicated that he had been apprehended by members of the Federal Bureau of Investigation. A similar entry had been effected in a Formal Report of Deserters or Absentees and was likewise offered in evidence at Bennett's trial. Relying on their own construction of the Coates case, supra, appellate defense counsel had conceded that the entries found in

**147**

these official records were legally sufficient to sustain a finding of apprehension. However, a majority of this Court disagreed with that view because of the interpretation that under pertinent Marine Corps directives—which differed from the provisions of the Navy's Bureau of Naval Personnel Manual—there existed no official duty to record the apprehension of an absentee in his service record. At the same time, it was pointed out that—subsequent to the dates of the entries with which the Court was there concerned—the Marine Corps had issued directives which left "no doubt that following June 19, 1953, a duty has existed in the Marine Corps to record apprehension of deserters in service record books and in the Formal Report."

In light of later developments, our discussion in Bennett of Army and Air Force precedents dealing with morning report entries merits repetition here:

". . . Out of an abundance of caution, we should perhaps add that the decision in United States v. Coates, supra, was in no respect designed to impinge on the rationale of the numerous Army and Air Force decisions holding that morning report entries reflecting apprehension are inadmissible under the hearsay rule. Moreover, we are little disposed to substitute for those decisions our own views concerning official duties imposed by the necessarily technical Army and Air Force directives governing the preparation of morning reports. Unless and until those directives are modified, the result of existing Army and Air Force decisions will stand so far as we are concerned.

"It must be clear that the distinction in outcome between Coates and the case at bar hinges wholly on differences in the duties imposed by the directive under which the documents reporting apprehension were prepared. Uniformity in result as among the several services is indeed a goal to be sought. However, this Court cannot with propriety achieve this happy end in instances where—as here—judicial action must be geared to the regulations of the several services, and where these regulations differ among themselves. Thus, while recognizing that a prima facie case of desertion terminated by apprehension is appreciably less difficult of establishment in a court-martial conducted under Navy auspices—or under those of the Marine Corps under current directives—than in one administered by the Army or Air Force, we are troubled little by this lack of uniformity. It is attributable solely to differing regulations among the several Armed Forces—and these may be changed at will. Each service may well be able to cite sound policies in support of its present position in this area—and naturally we express no opinion in the matter." [United States v. Bennett, 4 USCMA 309, 316, 15 CMR 309.]

One of us dissented in the Bennett case, but the position taken in the separate opinion expressing disagreement was based on the view that the entries in question *had* been made pursuant to an official duty reposing on the reporting officer, and that those entries sufficed fully to uphold the finding of apprehension there.

Finally there came United States v. Kitchen, 5 USCMA 541, 18 CMR 165, which brought into question the effect, in an Air Force desertion case, of a morning report entry asserting that the accused had returned to military control involuntarily. As we pointed out there, the Coates case had involved a holding that "in light of existing Navy Regulations—an entry in the accused's service record to the effect that he had been apprehended was *admissible and legally sufficient* to establish the fact recited." (Emphasis supplied). We distinguished Bennett where, under the phrasing of pertinent Marine Corps directives, "no official duty [existed] to record the fact of apprehension in an absentee's service record, and therefore . . . such a recital *was neither admissible nor legally sufficient* to support such a finding." [Emphasis supplied.]

We concluded that under Air Force directives in force at the time the entry concerning Kitchen was made, the term "involuntary return" did not necessarily

equate to "apprehension." However, it was noted that there did exist in that Service an official duty to recite that the return was "involuntary," if such was the case, with the result that, if material and relevant, the entry in question *was admissible* on the issue of apprehension—*although not of itself legally sufficient* to support a finding thereof. Because of this official duty to provide such an entry, we were sure that it fell within the official records exception to the prohibition against hearsay evidence. In the course of the opinion in Kitchen we said:

> ". . . We emphasized in Bennett, however, that it was distinctly open to these services to alter their personnel accounting directives, if they desired a result conformable to that reached in Coates as to the Navy. It appears that action of this nature has now been taken by the Air Force—for we observe that AFM 171–6, paragraph 23*g*(3), as revised in April 1954, requires that, on the return to military control of one dropped from the rolls following an unauthorized absence, the morning report entry shall include a statement as to 'whether the person returned voluntarily or was *apprehended* (as applicable).' (Emphasis supplied.) Cf. SR–335–50–1, dated August 6, 1954, paragraphs 63, 64." [United States v. Kitchen, 5 USCMA 541, 544, 18 CMR 165.]

### III

Under the Special Regulations governing Army personnel accounting in force prior to August 6, 1954, no requirement was provided that a morning report entry contain a statement of the circumstances under which an absentee soldier returned to military custody, and whether he was apprehended or had surrendered. SR 335–50–1, August 16, 1951, paragraphs 61, 62; United States v. Johnson [CM 364614], 11 CMR 458; United States v. Hurshman, [CM 352323], 5 CMR 242. However, in August 1954—less than three months after the appearance of our opinion in the Bennett case—the Army promulgated new Regulations relating to the preparation of morning reports, and in this directive it was required that, as to a returned absentee, an entry be made with respect to the "circumstances of return, whether surrendered or apprehended." SR 335–50–1, August 6, 1954, paragraph 63*c*.

It will be observed that this language conforms to the phrasing of the Navy's Bureau of Personnel Manual construed in Coates, save that the word "apprehended" was substituted for the term "delivered." Thus, there clearly was imposed in it the duty to report "whether the absentee was apprehended." Within the present context, we are sure, too, that the Regulation was designed to require the recordation of information with respect to whether the accused was "apprehended" *as that term is used in relation to trials for desertion*—namely, that the accused's return to military control was involuntary, and that it was not initiated by him or by persons acting at his request.

Appellate defense counsel have insisted that, although the entry here might be said to constitute "some evidence" of apprehension, it is not legally sufficient to sustain such a finding. Cf. United States v. Kitchen, supra. In this connection they point out that the Coates case reached us on the certified issue of whether the entry found there was admissible, and not at all on the issue of sufficiency. While the certification there was indeed limited as defense counsel indicate, it has long been recognized that this Court possesses unchallengeable authority to range beyond the narrow issue specified, once a case reaches us for review. No more than a hasty reading of the Coates opinion is required to reveal that we went beyond the single issue certified there—for, *inter alia,* we discussed and rejected the accused's contention that his initial absence could only be terminated by a return to Naval, as opposed to other military, custody. Also, there was at that time no doubt in our minds that the evidence in question, if admissible, was sufficient to sustain a finding of apprehension—and we believe this was made to appear by clear implication.

Later in United States v. Wilson, 4

USCMA 3, 15 CMR 3, we cited Coates as authority for the proposition that a finding of apprehension in a desertion case may "be rested solely on an official entry." It is true that, in the Bennett case, supra, we disavowed appellate defense counsel's concession based on Coates—but we did so on the single ground that they had misapprehended the effect of the Marine Corps directives with which they were dealing. In Kitchen, too, we reiterated the view that Coates constitutes authority for the rule that an official entry of apprehension is both admissible and legally sufficient to sustain the finding. Moreover—assuming that the matter was left open in Coates—it would be difficult to say that the present entry is insufficient to sustain a finding of apprehension in the face of our decisions to the effect that findings of guilty of absence without leave, breach of arrest, and escape from confinement may be rested safely on no more than an official entry found in a unit morning report or an accused's service record. See, e.g., United States v. Masusock, 1 USCMA 32, 1 CMR 32; United States v. Lowery, 2 USCMA 315, 8 CMR 115; United States v. Barrett, 3 USCMA 294, 12 CMR 50; United States v. Teague, 3 USCMA 317, 12 CMR 73; United States v. Wilson, supra. Indeed, in the Wilson case, supra, the entry held legally sufficient took the form of a corrective statement made many months after the event described.

Defense counsel here have also invited our attention to several of our cases holding that, in the area of stipulations, the use of the word "apprehended," when referring to an accused's arrest by civilian authorities, is insufficient to establish that he had been captured for the purposes of a desertion specification. See, e.g., United States v. Nickaboine, 3 USCMA 152, 11 CMR 152; United States v. Beninate, 4 USCMA 98, 15 CMR 98; United States v. Salter, 4 USCMA 338, 15 CMR 338. It is quite true that we have held to this effect in that field—and for the reason that we could not be certain of the content of meaning attached to the term by the parties to the stipulations with which we were concerned. Indeed, we felt that there was at least a fair risk that they might have equated "apprehended," as used, to something less than a return of the accused to military control uninitiated by him or by another acting at his request. And we are sure that no undue burden was placed on the Government in such a setting by requiring the simple expedient of greater specification.

In the sphere of Regulations, however, we must reach another result. As we interpret the provisions of SR 335–50–1 in its current form—against a background of its history and manifest purpose—a distinct duty is imposed to record the fact of apprehension of a returned absentee if, and only if, he was returned to military control against his will and by events and agencies wholly beyond his control. We believe that the reasons for these differing conclusions are so clear as to dispense with the need for elaboration. There is no scintilla of evidence in the present case to suggest that the reporting official failed properly to perform his duty—and it follows that the entry reflected in Prosecution Exhibit I sufficed to sustain the finding that Simone's desertion was terminated by apprehension as alleged.

IV

The decision of the board of review must stand.

Chief Judge QUINN and Judge LATIMER concur.